COLORADO DIVISION OF EMPLOYMENT AND TRAINING, DEPARTMENT OF LABOR AND EMPLOYMENT, Petitioner,

v.

PARKVIEW EPISCOPAL HOSPITAL and the Industrial Commission of the State of Colorado, Respondents.

No. 84SC473.

Supreme Court of Colorado, En Banc.

Sept. 29, 1986.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mary Karen Maldonado, Asst. Atty. Gen., Denver, for petitioner.

Peterson & Fonda, P.C., Thomas T. Farley, Pueblo, for respondent Parkview Episcopal Hosp.

No Appearance for respondent The Industrial Commission of the State of Colo.

ERICKSON, Justice.

We granted certiorari to review the decision of the court of appeals in *Colorado Division of Employment and Training v. Parkview Episcopal Hospital,* 701 P.2d 76 (Colo.App.1984), to consider whether a nonprofit corporation that paid unemployment taxes before January 1, 1969, and elects to become a reimbursable employer after January 31, 1972, may do so without filing a surety bond. The court of appeals answered the question in the affirmative. We reverse.

I.

*Nonprofit Employer Contributions Under The Colorado Employment Security Act*

Article 76 of Title 8 of the Colorado Revised Statutes, (1973 & 1984 Supp.)[1] is the portion of the Colorado Employment Security Act (CESA) which governs employer contribution to Colorado's unemployment fund. Prior to 1971, nonprofit organizations did not have to contribute to the fund. In 1970, Congress amended the Federal Unemployment Tax Act, I.R.C. §§ 3301–3311 (1982), (FUTA), to require states to include nonprofit employers in their unemployment schemes. *See* Employment Security Amendments of 1970, Pub.L. 91–373, § 104(b)(1), 84 Stat. 695, 697–98 (1970). Colorado complied with the 1970 FUTA amendments and, in 1971, CESA was amended to require nonprofit

1. All citations to the Colorado Employment Security Act will be to the 1973 bound volume of the Colorado Revised Statutes, and, where appropriate, to the 1984 Supplement. The 1985 Supplement is not cited because it contains recent amendments which do not govern this case.

employers to contribute to Colorado's unemployment fund. Ch. 228, sec. 2, § 82–1–3(7)(e), 1971 Colo.Sess.Laws 924, 926 (amending section 82–1–3(7)(e), 4 C.R.S. (1963), the predecessor of section 8–70–103(10)(e), 3 C.R.S. (1973), which defines "employment" as including services performed for I.R.C. § 501(c)(3) (1982) organizations).

As a general rule, private employers are "taxable employers," i.e., they must pay unemployment taxes regardless of whether their employees ever receive benefits. §§ 8–76–101 to –103, 3 C.R.S. (1973 & 1984 Supp.). Nonprofit employers, however, are entitled to elect a taxable or "reimbursable" method of contribution to the fund. § 8–76–110(2), 3 C.R.S. (1984 Supp.). A reimbursable employer differs from a taxable employer in that the former only makes payments to the Colorado Division of Employment and Training (Division) if its employees actually receive benefits. Payments are made in lieu of taxes to the Division at the end of each calendar quarter for benefits paid during that quarter. § 8–76–110(3), 3 C.R.S. (1984 Supp.).

A nonprofit organization which elects the reimbursable method of contribution is generally required to post a surety bond with the Division to cover benefits expected to be claimed. Section 8–76–110(4), 3 C.R.S. (1984 Supp.). Some reimbursable employers are exempt from the bond requirement, however. "Any organization which, under the provision of ... [section 8–76–110(2)(i)], is not required to make payments in lieu of taxes will not be required to file a surety bond ... until such time as said organization is required to make payments in lieu of taxes." Section 8–76–110(4)(b), 3 C.R.S. (1984 Supp.).

Section 8–76–110(2)(i), 3 C.R.S. (1984 Supp.), permits certain nonprofit employers who elect reimbursable coverage to use their "account excess" prior to making payments.[2] "Account excess" is the amount by which the employer's contributions prior to the date of its election exceeds the amount of benefits paid to its employees. See § 8–76–110(2)(i), 3 C.R.S. (1984 Supp.). Subsection (2)(i) permits designated employers to consume this excess or surplus before having to make quarterly payments or, by virtue of subsection 4(b), having to post the bond. §§ 8–76–110(2)(i), (4)(b), 3 C.R.S. (1984 Supp.). The Colorado statutory scheme provides several methods for electing reimbursable coverage,[3] but only those employers that elect reimbursable coverage, in our view prior to January 31, 1972, under subsection (2)(d) of section 8–76–110 are entitled to use account excess and are exempt from the bond requirement until the excess is depleted.

## II.

### Facts

The parties stipulated to the facts in this case. Parkview is a nonprofit organization as defined in I.R.C. § 501(c)(3) (1982), and is therefore exempt from federal income taxes. I.R.C. § 501(a) (1982). Parkview was not required to participate in CESA prior to January 1, 1972. However, Parkview opted to become a covered employer in 1959. See §§ 82–1–3(7)(e)(vii), 82–6–7, 4 C.R.S. (1953). Parkview contributed to the

---

**2.** Section 8–76–110(2)(i), 3 C.R.S. (1984 Supp.), states:

> Notwithstanding any other provisions of articles 70 to 82 of this title, any nonprofit organization which, prior to January 1, 1969, paid taxes required by articles 70 to 82 of this title and which elects, pursuant to paragraph (d) of this subsection (2), to make payments in lieu of taxes shall not be required to make any such payment on account of any regular or extended benefits paid and attributable to wages paid for service performed in its employ for weeks of unemployment which begin on or after the effective date of such election

until the total amount of such benefits equals the amount by which the taxes paid by such organization with respect to a period before such election exceed benefits paid for the same period and charged to the experience rating account of such organization, as of the effective date of such election.

**3.** Our holding that Parkview is not able to make an election pursuant to subsection 8–76–110(2)(d), 3 C.R.S. (1984 Supp.), does not preclude Parkview from electing reimbursable coverage under another subsection of 8–76–110. See § 8–76–110(2)(f), 3 C.R.S. (1984 Supp.).

fund by the taxable method until October, 1982, when Parkview made its election to change to the reimbursable status. The election was to be effective January 1, 1983.

The Division advised Parkview that it would have to post a bond in the amount of $84,202. Parkview took the position that it did not have to post a bond until its account excess of $200,000 was exhausted. The Division disagreed, asserting that Parkview did not qualify for the bond exemption under section 8–76–110(4)(b) because Parkview did not make a timely election under subsection (2)(d) of section 8–76–110.

The parties agree that, in order to use account excess and qualify for the bond exemption, an employer must make a timely election under subsection (2)(d) of section 8–76–110, 3 C.R.S. (1984 Supp.). The dispute arose because subsection (2)(d) is unclear as to when a timely election occurs:

> Any [I.R.C. § 501(c)(3) nonprofit organization] . . . which was liable under the provisions of the "Colorado Employment Security Act" . . . prior to January 1, 1972, . . . may elect to become liable for payments in lieu of taxes for a period of not less than one calendar year beginning on or after January 1, 1972, if written notice of such election is filed with the division within thirty days after January 1 of *such year.*

Section 8–76–110(2)(d), 3 C.R.S. (1984 Supp.) (emphasis added).

The disputed term is "such year." The Division argues that "such year" refers to 1972. Consequently, Parkview is not entitled to use account excess because it did not give notice of an election of the reimbursable status by January 31, 1972. Parkview contends the term "such year" refers to the phrase "one calendar year beginning on or after January 1, 1972." Thus, Parkview asserts it is entitled to use account excess in lieu of a bond because it filed written notice within thirty days of January 1, 1983, and the year 1983 is a calendar year beginning on or after January 1, 1972.

A hearing was conducted and the referee held that Parkview was not entitled to utilize its account excess in lieu of the bond requirement. Parkview appealed to the Industrial Commission (Commission) which reversed the referee's order. The Commission concluded that subsection (2)(d) covered Parkview's election and that Parkview was entitled to exhaust its account excess before being required to post a bond. The court of appeals unanimously affirmed the Commission's final order. We granted certiorari and reverse the court of appeals.

### III.

### *Analysis*

**A.** *Judicial Review of Decisions of the Colorado Industrial Commission.*

Appeals from the Commission in this context are governed by Article 74 of Title 8 of the Colorado Revised Statutes. Section 8–76–113, 3 C.R.S. (1984 Supp.). Section 8–74–107(6), 3 C.R.S. (1984 Supp.), sets forth the scope of judicial review applicable to orders of the Commission:

> A commission decision may be set aside only upon the following grounds:
> (a) That the commission acted without or in excess of its powers;
> (b) That the decision was procured by fraud;
> (c) That the findings of fact do not support the decision;
> (d) *That the decision is erroneous as a matter of law.*

(Emphasis added.)

■ Courts are not bound by a Commission decision that misconstrues or misapplies the law. *Industrial Commission v. Bysom,* 166 Colo. 502, 444 P.2d 627 (1968); *Industrial Commission v. Rowe,* 162 Colo. 248, 425 P.2d 274 (1967). The construction of a statute is a question of law. *Knoll v. Trans World Airlines, Inc.,* 610 F.Supp. 844 (D.Colo.1985). While we recognize that construction of a statute by an administrative agency charged with its enforcement should be given great deference by the courts, *City & County of Denver v. Industrial Commission,* 690 P.2d

199 (Colo.1984), we are not absolutely bound by the construction of the agency. *Cf. Travelers Indemnity Co. v. Barnes,* 191 Colo. 278, 552 P.2d 300 (1976) (courts have a duty to invalidate administrative regulations which contradict statute). Administrative construction of a statute should not be adopted where a different construction is plainly required, or where the result reached by the agency is clearly inconsistent with legislative intent. *Nevada Power Co. v. Watt,* 711 F.2d 913 (10th Cir.1983); *Watts v. Hadden,* 686 F.2d 841 (10th Cir.1981). The interrelationship of CESA and FUTA, and the legislative history of FUTA convince us that the Commission's order is contrary to the intent of the General Assembly.

## B. *The History of CESA and FUTA*

The Colorado Employment Security Act is essentially a companion act to FUTA. The interrelationship of the federal act and the various state unemployment acts is well-known. *See, e.g., Lutheran Church-Missouri Synod v. Bowling,* 89 Ill.App.3d 100, 44 Ill.Dec. 404, 411 N.E.2d 526 (1980). The original predecessor of CESA was enacted in 1936, during an extraordinary session of the General Assembly which was called "principally by reason of the passage by Congress of the United States of the comprehensive Social Security Act...." Proclamation of Governor Johnson, 1936 Colo.Sess.Laws, 3d Ex. Session 9. The close connection of the federal and state statutes persists today.[4]

When Congress amended FUTA in 1970 to require coverage of nonprofit corpora- tions, Congress also required states to allow nonprofit employers to elect the reimbursable method of contribution, in addition to the taxable method required of other employers. *See* Employment Security Amendments of 1970, Pub.L. 91–373, § 104(b)(1), 84 Stat. 695, 697–98 (1970) (adding new I.R.C. § 3309(a) (1982)). Congress recognized that, prior to 1970, many states, including Colorado, permitted nonprofit employers to participate in unemployment insurance funds. *See, e.g.,* section 82–6–7, 4 C.R.S. (1953). Nonprofit employers who participated prior to 1970 might have developed account excesses, which would be available to those employers if they elected to switch to the reimbursable method. Congress provided that states could allow nonprofit employers to use their account excess without violating the otherwise mandatory experience-rated contribution formula. I.R.C. § 3303(f), which was added by section 104(c) of the Employment Security Amendments of 1970, originally provided:

> To facilitate the orderly transition to coverage of service to which section 3309(a)(1)(A) applies [services performed for I.R.C. § 501(c)(3) nonprofit organizations], a State law may provide that an organization ... which elects, *when such election first becomes available under the State law,* to make payments (in lieu of contributions) into the State unemployment fund ..., and which had paid contributions into such fund ... before January 1, 1969, [may use its account excess before making any payments under the reimbursable method].[5]

---

**4.** For example, the federal statute imposes a six percent excise tax on total wages paid by an employer. I.R.C. § 3301 (1982). The employer is allowed to credit up to ninety percent of the contributions made to a state unemployment fund against the federal tax. I.R.C. §§ 3302, 3303 (1982). The federal tax credit is available only if the Secretary of Labor approves the state law per I.R.C. § 3304 (1982). State legislatures therefore have a compelling incentive to abide by the requirements of FUTA. Noncompliance could result in the forfeiture of the tax credits available to all employers who make contributions to the fund.

**5.** The language, "when such election first became available under state law," was amended in 1976 to read "before April 1, 1972." Unemployment Compensation Amendments of 1976, Pub.L. No. 94–566, § 122(b), 90 Stat. 2667, 2676 (1976). A new subsection (g) was added to I.R.C. § 3303, which applied to nonprofit employers included by virtue of the 1976 amendments (e.g., nonprofit elementary and secondary schools). Section 3303(g) required these newly covered nonprofit employers to make their election "when such election first becomes available under the State law...." Unemployment Compensation Amendments of 1976,

Employment Security Amendments of 1970, Pub.L. 91–373, § 104(c), 84 Stat. 695, 699 (1970) (emphasis added).

Section 3303(f) makes the use of account excess by previously participating nonprofit employers who elect reimbursable coverage optional with the state. The language of section 3303(f) is clear, however, that if the state chooses to allow a nonprofit employer to use account excess, that employer must elect at the first opportunity under state law.

The legislative history of the federal amendments is equally clear:

> State programs would be required to permit nonprofit organizations the option of reimbursing the State for unemployment compensation payments attributable to service for them rather than paying regular State unemployment compensation taxes.... States would be allowed to put the reimbursement option into effect at any time after December 31, 1969. For nonprofit organizations covered by state laws on a contributory basis prior to January 1, 1969, States would be permitted to provide a transitional provision *under which an organization which elects at its first opportunity* to change from a contributions basis to a reimbursement basis would receive credit for the amount by which past contributions exceeded benefit payments attributable to service for them.

S.Rep. No. 91–752, 91st Cong., 2d Sess. 3, *reprinted in* 1970 U.S.Code Cong. & Ad. News 3606, 3609 (emphasis added). *Cf.* S.Rep. No. 94–1265, 94th Cong., 2d Sess. 10, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5997, 6005–06.

■ The federal amendments and their legislative history demonstrate that states could permit nonprofit employers to use account excess if and only if the employers elected the reimbursable method when it first became available under state law. Section 8–76–110, 3 C.R.S. (1984 Supp.),

Pub.L. No. 94–566, § 122(a), 90 Stat. 2667, 2675 (1976).

Technically, only section 3303(f) applies to this case. Thus, after 1976, federal law required

was undoubtedly passed in response to the 1970 amendments to the federal act. The term "such year" must refer to 1972 because the federal act required the election to be made at the first opportunity under state law. The first opportunity to elect the reimbursable method in Colorado was January 1, 1972. Ch. 228, sec. 20, 1971 Colo.Sess.Laws 924, 946. Parkview cannot use its account excess under 8–76–110(2)(i) because it did not make its election until twelve years after the election first became available in Colorado. Section 8–76–110(2)(d), 3 C.R.S. (1984 Supp.). Consequently, Parkview does not fall under the bond exemption of section 8–76–110(4)(b).

■ Our resolution of this issue finds additional support in the fact that the General Assembly amended subsection (2)(d) in 1985. The ambiguous term "such year" was deleted and replaced with "1972." The section, as amended, allows previously participating nonprofit employers to elect the reimbursable status "if written notice of such election is filed with the division within thirty days of January 1, 1972." Ch. 84, sec. 5, § 8–76–110, 1985 Colo.Sess.Laws 372, 375. Parkview relies on the presumption that when a statute is amended there is an intent to change the law, and urges us to resolve the case so as to permit its use of account excess. We decline to do so because the maxim of statutory interpretation upon which Parkview relies does not apply where, as here, a law is amended to clarify an ambiguity. *Cf. Bar 70 Enterprises, Inc. v. Tosco Corp.*, 703 P.2d 1297, 1304 n. 5 (Colo.1985); *People v. Hale*, 654 P.2d 849, 851 (Colo.1982).

Parkview has raised several arguments which deserve consideration. Parkview asserts (1) that the construction of "such year" we have used renders the term "calendar year beginning on or after January 1, 1972" meaningless, and (2) under the construction of "such year," section 8–76–

nonprofit employers to elect by April 1, 1972. Colorado was more restrictive and continued to require subsection (2)(d) employers to elect by January 31, 1972.

110(2)(d) has had no meaning since January 31, 1972.

■ Section 8–76–110(2)(d), 3 C.R.S. (1984 Supp.), states "an employer may elect to become liable for payments ... for a period of not less than one calendar year *beginning on or after* January 1, 1972, if written notice is filed with the division within thirty days after January 1 of such year." (Emphasis added.) Parkview argues that if "such year" is construed to mean 1972, nonprofit employers are precluded from electing reimbursable coverage for calendar years beginning after 1972. Parkview has misconstrued the statute. In our view, a nonprofit organization that has paid unemployment taxes may elect to become a reimbursable employer under subsection 2(d) after 1972. Since the time to file an election under subsection 2(d) has expired, the applicable section is subsection (f), which provides:

> Any nonprofit organization which has been paying taxes under articles 70 to 82 of this title for a period subsequent to January 1, 1972, may change to a reimbursable basis by filing with the division not later than thirty days prior to the beginning of any taxable year a written notice of election to become liable for payments in lieu of taxes....

Our construction of the term "such year" of subsection (2)(d) in no way prohibits Parkview from switching to a reimbursable status, as an election remains available under subsection (2)(f).

Parkview also asserts that the construction of section 8–76–110(2)(d) we have adopted strips it of any effect since 1972. We agree, but this fact does not compel a different result. Subsection (2)(d) was enacted as a mechanism to enable appropriate employers to use account excess per subsection (2)(i). I.R.C. § 3303(f) was enacted "[t]o facilitate the orderly transition" to reimbursable coverage for nonprofit employers. I.R.C. § 3303(f) (1982). To allow the transition period to continue indefinitely would result in unpredictability in the unemployment compensation fund from the standpoint of an actuary. Simply stated, the Colorado transition period ended January 31, 1972.

The legislative history of section 8–76–110(2)(d) requires the term "such year" to be interpreted as meaning the year 1972 and no other year. Parkview is therefore not entitled to use its account excess in lieu of payments under subsection 110(2)(i), nor is it exempt from the bond requirement under subsection 110(4)(b).

Accordingly, the decision of the court of appeals is reversed and the case is remanded to the court of appeals with directions to reverse the decision of the Industrial Commission.