**DOUGLAS COUNTY BOARD OF EQUALIZATION, Petitioner,**

v.

**FIDELITY CASTLE PINES, LTD.; Colorado Castle Pines Realty, Inc.; Castle Pines Fidelity Associates Limited Partnership; and Board of Assessment Appeals of the State of Colorado, Respondents.**

**DOUGLAS COUNTY BOARD OF EQUALIZATION, Petitioner,**

v.

**ROXBOROUGH VILLAGE JOINT VENTURE—ROXBOROUGH ACQUISITION CORPORATION, and Board of Assessment Appeals of the State of Colorado, Respondents.**

**Nos. 94SC8, 94SC19.**

Supreme Court of Colorado,
En Banc.

Feb. 21, 1995.

Office of the County Attorney, Douglas County, Colorado, Thomas W. McNish, Asst. County Atty., Castle Rock, for petitioner in Nos. 94SC8 and 94SC19.

Barry J. Goldstein, Denver, for respondents Fidelity Castle Pines, Ltd., Colorado Castle Pines Realty, Inc. and Castle Pines Fidelity Associates Ltd. Partnership in No. 94SC8.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Larry A. Williams, First Asst. Atty. Gen., General Legal Services Section, Denver, for respondent Bd. of Assessment Appeals of State of Colorado in Nos. 94SC8 and 94SC19.

Barry J. Goldstein, Denver, for respondent Roxborough Village Joint Venture—Roxborough Acquisition Corp. in No. 94SC19.

Justice LOHR delivered the Opinion of the Court.

■ We granted certiorari to review two decisions of the Colorado Court of Appeals that present a common issue as to the manner of valuing vacant land for property tax assessment purposes. The issue is whether section 39–1–103(14)(b), 16B C.R.S. (1991 Supp.), prior to its amendment in 1992, required assessing officers to consider indirect costs, such as developer's profit and overhead, as part of the "cost of development" when using the market approach to appraisal. The 1992 amendment disallowed consideration of indirect costs, thereby raising the question of whether the 1992 amendment changed or merely clarified the prior law. In *Fidelity Castle Pines, Ltd. v. Douglas County Bd. of Equalization*, No. 92CA1453 (Colo. App. Nov. 12, 1993) (not selected for official publication), the court of appeals reversed a decision of the Board of Assessment Appeals (BAA) which held that indirect costs should not be considered. In *Roxborough Village v. Douglas County Bd. of Equalization*, No. 92CA1414 (Colo.App. Nov. 18, 1993) (not selected for official publication), the court of appeals affirmed a decision of the BAA which required consideration of indirect costs. We hold that prior to amendment in 1992, section 39–1–103(14)(b) required indirect costs to be considered when using the market approach to appraising vacant land for tax assessment purposes and that the 1992 amendment changed rather than clarified existing law. We therefore affirm the judgment of the court of appeals in each of the two cases.

I.

We first outline the basic facts and procedural history of the two cases.

A.

Roxborough Village Joint Venture—Roxborough Acquisition Corporation (Roxborough) owns approximately 408 acres of unplatted vacant land, 180 platted lots in four subdivisions, and 16.4 acres of platted commercial property in Douglas County, Colorado. To determine the valuation for assessment of this land for the 1991 tax year, the Douglas County assessor used the market approach to appraisal and determined the present value of each of the properties to which this appeal relates by present worth discounting. Section 39–1–103(14)(b) specifically authorizes appraisers to use present worth discounting when valuing vacant land. Present worth discounting requires: (1) determination of the estimated retail prices of the lots or parcels into which the properties are to be divided for sale,[1] (2) deduction of the costs of development that are to be in-

---

**1.** The main device assessors use to determine the retail sales price of properties for purposes of present worth discounting is the comparable sales method. When a sufficient number of comparable sales is not available, assessors have other means of arriving at the unadjusted retail price of the property. *See* 3 *Assessor's Reference Library: Land Valuation Manual* 1.74–1.79 (Rev. 1/92). The assessor employed some of these other methods when arriving at the retail price of some of the Roxborough properties. Our analysis of the proper consideration of indirect costs in present worth discounting is not affected by the various methods an appraiser might use to arrive at the retail price of particular parcels.

curred in preparing the lots or parcels for sale to arrive at an adjusted retail price, (3) estimation of the time periods required to sell the lots or parcels in order to arrive at a market absorption rate, and (4) selection of an appropriate discount rate. Utilizing this data, an appraiser is able to calculate the present worth of the vacant land, which is its market value.

The present worth discounting process recognizes that developers who sell large numbers of lots over a period of time will not realize the full value of their properties until sometime in the future. The present worth discounting process accounts for the time value of money, i.e., a payment received today is more valuable than a payment received in the future. Essentially, this method arrives at present value by treating the value of individual parcels like payments in an anticipated future annuity stream and discounting those anticipated payments to present value. See El Paso County Bd. of Equalization v. Craddock, 850 P.2d 702, 705–06 (Colo.1993) (explaining in more detail the present worth discounting method of determining market value as contemplated by section 39–1–103(14)(b)).

In deducting anticipated costs of development in order to arrive at adjusted retail prices for the Roxborough properties as part of the present worth discounting process, the assessor included direct costs—sometimes referred to as hard costs—such as the costs of constructing roads and installing utilities. The assessor, however, declined to include indirect costs—sometimes referred to as soft costs—such as the developer's overhead and profit.

Roxborough appealed Douglas County's assessment of the property to the BAA. See § 39–8–108, 16B C.R.S. (1994). Roxborough sought reductions in valuation, arguing that the BAA and the court of appeals have consistently required deduction of indirect costs for proper valuation of vacant land. The BAA determined that Roxborough was enti-

tled to a 10 percent allowance for indirect costs, calculated as a percentage of the unadjusted retail price, for all property eligible for present worth discounting.[2] In so ruling, it held that indirect costs were allowable as a "cost of development" under section 39–1–103(14)(b) prior to its amendment in 1992. The BAA ruled that the 1992 amendment, allowing only direct costs to be considered, changed existing law and was only prospective in effect. Douglas County appealed the BAA's ruling to the court of appeals. Roxborough cross appealed the BAA's decision to allow only a 10 percent adjustment for indirect costs instead of the greater amounts for which it had contended.

The court of appeals in an unpublished opinion affirmed the BAA's ruling. Roxborough Village v. Douglas County Bd. of Equalization, No. 92CA1414 (Colo.App. Nov. 18, 1993) (not selected for official publication). The court of appeals adopted the reasoning in Commercial Federal Sav. & Loan Ass'n v. Board of Assessment Appeals, 867 P.2d 17 (Colo.App.1993), and held that "the 1992 amendments to § 39–1–103(14)(b) prohibiting the consideration of soft or indirect costs did not constitute a clarification of prior law, but instead changed the law in this respect." Roxborough Village, slip op. at 3. Therefore, the court of appeals determined that prior to the 1992 amendment, section 39–1–103(14)(b) permitted deduction of a developer's indirect costs when valuing vacant land. In addition, the court of appeals ruled that the amount of the deduction for indirect costs is a question of fact for the BAA. Id. Because the court found that the BAA's decision was supported by evidence in the record, it affirmed the BAA's decision to allow only a 10 percent adjustment for indirect costs.[3] Id., slip op. at 5.

### B.

Fidelity Castle Pines, Ltd., Colorado Castle Pines Realty, Inc., and Castle Pines Fi-

---

**2.** Under § 39–1–103(14)(b), both before and after the 1992 amendment, when "eighty percent of the lots within an approved plat have been sold," the property is no longer eligible for present worth discounting.

**3.** Roxborough did not seek certiorari review of the court of appeals' ruling affirming the BAA's decision to allow only a 10 percent adjustment for indirect costs. Therefore, this issue is not before us.

delity Associates Limited Partnership (collectively, Castle Pines) owns 212 parcels of vacant land in Douglas County. The Douglas County assessor determined the value of these parcels for assessment for the 1991 tax year in a manner analogous in all relevant respects to that used in valuing the Roxborough properties. *See supra* pp. 4–5. In the present worth discounting calculations, the assessor adjusted retail prices to reflect direct costs but denied adjustments for indirect costs.

Castle Pines appealed Douglas County's valuation for assessment to the BAA and requested that the BAA adjust the valuation to account for indirect costs. § 39–8–108, 16B C.R.S. (1994). The BAA determined that the 1992 amendment to section 39–1–103(14)(b) prohibiting deduction of indirect development costs simply clarified the meaning of section 39–1–103(14)(b) as in effect prior to the amendment. The BAA held that the earlier version did not allow deduction of indirect costs and rejected Castle Pines' request for a reduction in assessed valuation.

Castle Pines appealed, and the court of appeals in an unpublished decision reversed the BAA's ruling. *Fidelity Castle Pines, Ltd. v. Douglas County Bd. of Equalization,* No. 92CA1453 (Colo.App. Nov. 12, 1993) (not selected for official publication). The court of appeals adopted the reasoning in *Commercial Federal Sav. & Loan Ass'n,* and rejected Douglas County's argument that the 1992 amendment to section 39–1–103(14)(b) constituted a clarification of the statute rather than a change. *Fidelity Castle Pines, Ltd.,* slip op. at 1. Therefore, the court of appeals remanded the case to the BAA for reconsideration of Castle Pines' valuation in light of the court's determination that prior to the 1992 amendment, section 39–1–103(14)(b) required assessors to consider indirect costs during the valuation process.

Douglas County sought certiorari review of the court of appeals' decisions in both the *Roxborough* case and the *Fidelity Castle*

*Pines* case. We granted certiorari, and consolidated the cases for review, to determine:

> Whether the court of appeals erred in concluding that the General Assembly, in amending section [39–1–103(14)(b) ] in 1992 to exclude a developer's profit and overhead in the valuation of vacant land, intended to change the law as it existed prior to this amendment rather than clarify the law as it existed before the amendment.[4]

We now conclude that the 1992 amendment to section 39–1–103(14)(b) changed rather than clarified the earlier version of the statute. The court of appeals properly analyzed this issue in arriving at the same conclusion in *Commercial Federal Sav. and Loan Ass'n,* 867 P.2d 17. *Accord Resolution Trust v. Bd. of County Comm'rs,* 860 P.2d 1383, 1388 (Colo.App.1993). Therefore, we hold that section 39–1–103(14)(b) as in effect prior to the 1992 amendment required assessors to take into account indirect costs when valuing vacant land under the market approach.

## II.

The Colorado Constitution, Article X, Section 3, establishes a framework for uniform taxation of real and personal property. Determination of actual value of property is an essential component of that framework. The constitution sets forth the general procedure for determining actual value and authorizes legislative and regulatory elaboration:

> The actual value of all real and personal property not exempt from taxation under this article shall be determined under general laws, which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of all real and personal property not exempt from taxation under this article. Valuations for assessment shall be based on appraisals by assessing officers to determine the actual value of property in accordance with provisions of law, which laws shall provide that actual value be determined by appropriate consideration of

---

4. We erroneously cited § 39–1–104(14)(b) in our notice granting certiorari. The parties correctly briefed the issue as if we had cited § 39–1–103(14)(b). We now decide this case based on

§ 39–1–103(14)(b) and not on § 39–1–104(14)(b). The indirect costs at issue are also more extensive than developer's profit and overhead.

cost approach, market approach, and income approach to appraisal.

Colo. Const. art. X, § 3.

In order to "exercise the authority granted in section 3 of Article X" for determination of actual value, the General Assembly has adopted provisions for determining the actual value of various types of property. § 39–1–101, 16B C.R.S. (1994). A specific provision for determining the actual value of vacant land [5] was first enacted in 1988 in order to address an apparent wide disparity in appraisal methods utilized by assessing offices throughout the state. Ch. 268, sec. 4, § 39–1–103(14), 1988 Colo.Sess.Laws 1276, 1281. Section 39–1–103(14)(b), which governs the valuations of vacant land at issue in this case, provided:

> The assessing officers shall give appropriate consideration to the cost approach, market approach, and income approach to appraisal as required by the provisions of section 3 of article X of the state constitution in determining the actual value of vacant land. When using the market approach to appraisal in determining the actual value of vacant land, assessing officers shall take into account, but need not limit their consideration to, the following factors: The anticipated market absorption rate, the size and location of such land, *the cost of development,* any amenities, any site improvements, access, and use. When using anticipated market absorption rates, the assessing officers shall use appropriate discount factors in determining the present worth of vacant land until eighty percent of the lots within an approved plat have been sold and shall include all vacant land in the approved plat. The use of present worth shall reflect the anticipated market absorption rate for the lots within such plat, but such time period shall not generally exceed thirty years.

§ 39–1–103(14)(b), 16B C.R.S. (1991 Supp.) (emphasis added).

Section 39–1–103(14)(b) remained in effect as originally adopted, with amendments not pertinent here, until 1992, when it was amended effective June 2 of that year to provide as follows:

> The assessing officers shall give appropriate consideration to the cost approach, market approach, and income approach to appraisal as required by the provisions of section 3 of article X of the state constitution in determining the actual value of vacant land. When using the market approach to appraisal in determining the actual value of vacant land as of the assessment date, assessing officers shall take into account, but need not limit their consideration to, the following factors: The anticipated market absorption rate, the size and location of such land, *the direct costs of development,* any amenities, any site improvements, access, and use. When using anticipated market absorption rates, the assessing officers shall use appropriate discount factors in determining the present worth of vacant land until eighty percent of the lots within an approved plat have been sold and shall include all vacant land in the approved plat. *For purposes of such discounting, direct costs of development shall be taken into account.* The use of present worth shall reflect the anticipated market absorption rate for the lots within such plat, but such time period shall not generally exceed thirty years. *For purposes of this paragraph (b), no indirect costs of development, including, but not limited to, costs relating to marketing, overhead, or profit, shall be considered or taken into account.*

§ 39–1–103(14)(b), 16B C.R.S. (1994) (emphasis added).

In further implementation of its authority under Article X, Section 3, of the Colorado Constitution, the General Assembly has directed the property tax administrator to prepare manuals, procedures, and instructions for appraisals. Section 39–2–109(1)(e), 16B

---

**5.** § 39–1–103(14)(c)(I), 16B C.R.S. (1994), defines vacant land as "any lot, parcel, site, or tract of land upon which no buildings, structures, or fixtures are located." Vacant land can include land with site improvements. *Id.* In addition, if the vacant land is eligible for present worth discounting under the market approach to appraisal, it may be part of a development tract or subdivision. *Id.*

C.R.S. (1994), contains that directive and provides:

(1) It is the duty of the property tax administrator, and he shall have and exercise authority:

. . . .

(e) To prepare and publish from time to time manuals, appraisal procedures, and instructions, after consultation with the advisory committee to the property tax administrator and the approval of the state board of equalization, concerning methods of appraising and valuing land, improvements, personal property, and mobile homes and to require their utilization by assessors in valuing and assessing taxable property. Said manuals, appraisal procedures, and instructions shall be based upon the three approaches to appraisal and the procedures set forth in section 39-1-103(5)(a).[6] Such manuals, appraisal procedures, and instructions shall be subject to legislative review, the same as rules and regulations, pursuant to section 24-4-103(8)(d), C.R.S.

The *Assessors Reference Library* has been prepared and approved pursuant to this direction. The *Land Valuation Manual* constitutes volume three of the *Assessors Reference Library* and relates to land valuation. 3 *Assessor's Reference Library: Land Valuation Manual* (Rev. 1/92) (hereinafter *Land Valuation Manual*).

### III.

In the present cases, no party contends that the assessor failed to give appropriate consideration to the cost approach and the income approach to appraisal before electing to value the property by the market approach. Nor is there any contention that the present worth discounting method of arriving at market value was not appropriate in determining the valuations for assessment that are

at issue in this case. *See* § 39-1-103(14)(b) (precluding use of present worth discounting after 80 percent of the lots within an approved plat have been sold). *Cf. Craddock*, 850 P.2d 702, 707 (in certain situations, present worth discounting need not be utilized by an assessor in appraising vacant land for tax assessment purposes). Rather, the sole issue is whether prior to the 1992 amendment to section 39-1-103(14)(b), an assessor was required to consider indirect costs as part of the "cost of development" in arriving at the adjusted sales price of vacant land for use in present worth discounting under the market approach to appraisal. Put another way, the issue is whether the 1992 amendment to section 39-1-103(14)(b), disallowing consideration of indirect costs in the present worth discounting process, changed pre-existing law or merely clarified it.

### A.

Section 39-1-103(14)(b) does not define the term "cost of development," which is found in the statute prior to the 1992 amendment. The parties agree that the term "cost of development" encompasses direct costs for labor and materials necessary to construct physical site improvements such as streets, curbs and gutters, and sewage and drainage facilities. *See Land Valuation Manual* at 1.53;[7] *see also* American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 16 (9th ed. 1987) (hereinafter *The Appraisal of Real Estate*). The parties disagree as to whether the term "cost of development" includes indirect costs, commonly referred to as soft costs.

Indirect costs are development costs generally not related to specific site improvements but necessary to develop and sell the land. *Land Valuation Manual* at 1.52; *see The Appraisal of Real Estate* at 16. They include administrative expense, marketing

---

**6.** § 39-1-103(5)(a), 16B C.R.S. (1994), provides, in relevant part:

All real and personal property shall be appraised and the actual value thereof for property tax purposes determined by the assessor of the county wherein such property is located. The actual value of such property, . . . shall be that value determined by appropriate consider-

ation of the cost approach, the market approach, and the income approach to appraisal.

**7.** The *Land Valuation Manual* states that hard costs include, but are not limited to, curbs and gutters; streets; culverts; sewage facilities; drainage facilities; utility easements and hookups; clear, grade and finish; sidewalks; and soil tests. *Land Valuation Manual* at 1.53.

costs, and engineering costs. *Land Valuation Manual* at 1.53.[8] In addition, developer profit is also referred to as an indirect cost. Developer profit is a figure that reflects the amount that an entrepreneur, or developer, expects to receive in addition to costs as compensation for the developer's efforts and risk. *The Appraisal of Real Estate* at 359. Together, indirect costs encompass the expenses incident to creating and marketing a development that do not result in tangible improvements to the land.

### B.

As noted above, section 39–1–103(14)(b) as it existed prior to the 1992 amendment did not define the term "cost of development." Both parties agree that the term "cost of development" as used in the statute is ambiguous. The term could reasonably refer either to direct costs alone or to direct costs and indirect costs. Because the meaning of the term "cost of development" is unclear, we will interpret it using our well developed rules of statutory construction. *See* § 2–4–203(1), 1B C.R.S. (1980).

■ Generally, we interpret ambiguous tax statutes in favor of the taxpayer. *Transponder Corp. of Denver, Inc. v. Property Tax Administrator,* 681 P.2d 499, 504 (Colo. 1984). Application of this rule would result in a construction that the term "costs of development" requires consideration of both direct and indirect costs when valuing vacant land under the present worth discounting method.

Douglas County argues, however, that the 1992 amendment to section 39–1–103(14)(b) simply clarified the original intent of the legislature to exclude indirect costs from consideration in valuing vacant land. Therefore, Douglas County asserts, the term "cost of development" in section 39–1–103(14)(b) as it existed prior to amendment meant direct costs of development. We disagree.

■ There is a presumption that when the legislature amends a statute it intends to change the law. *Charnes v. Lobato,* 743 P.2d 27, 30 (Colo.1987); *People v. Hale,* 654 P.2d 849, 851 (Colo.1982). This presumption may be rebutted by a showing that the General Assembly amended the statute in order to clarify an ambiguity. *Rickstrew v. People,* 822 P.2d 505, 508 (Colo.1991); *Colo. Div. of Employment and Training v. Parkview Episcopal Hosp.,* 725 P.2d 787, 792 (Colo. 1986).[9] It may also be rebutted in cases where the General Assembly "merely makes more specific what might have been implicit in the prior statutory terminology." *Bar 70 Enterprises, Inc. v. Tosco Corp.,* 703 P.2d 1297, 1304 n. 5 (Colo.1985).

We conclude that the presumption that a subsequent amendment to a statute is a change rather than a clarification has not been rebutted in this case. We have found an amendment to be a clarification only in those situations where legislative history or the language of the statute clearly indicates an intent to clarify. *See Rickstrew v. People,* 822 P.2d at 508 (legislative history of closely related statute indicated amendment was a clarification); *Colo. Div. of Employment and Training,* 725 P.2d 787, 792 (Colo.1986) (legislative history of original version of statute indicated that amendment was a clarification rather than a change).

In this case, we discover no indication that the legislature intended merely to clarify section 39–1–103(14)(b) by substituting the term "direct costs of development" for the term "cost of development" and by explicitly disallowing consideration of indirect costs. First, the legislature has used no language within the 1992 amendment itself to indicate that it meant to clarify the factors that assessors must take into account when valuing proper-

---

8. The *Land Valuation Manual* states that indirect costs include, but are not limited to, guest generation, sales overhead, commissions expense, administrative expense, entrepreneurial profit, marketing costs, engineering, environmental compliance, and holding costs. *Land Valuation Manual* at 1.53.

9. There is some tension between our precedent that we interpret ambiguous tax statutes in favor of the taxpayer and our precedent that statutory amendments may clarify existing law. Because we conclude that the 1992 amendment to section 39–1–103(14)(b) was a change in the statute rather than a clarification, we need not resolve this tension.

ty. Second, in the real estate appraisal industry both direct and indirect costs are taken into account as part of the cost of development in valuing vacant land when subdivision and development represent the highest and best use of the property. *The Appraisal of Real Estate* at 305. Direct costs of development are a subset of the total "cost of development." The two terms are not equivalent. Therefore, disallowance of consideration of indirect costs, as effected by the 1992 amendment, represents a material change; it is not a clarification.

In addition, other statutes in effect in 1988 at the time of enactment of section 39–1–103(14)(b) distinguished between direct and indirect costs. *See* § 34–1–105, 14 C.R.S. (1984) (geological survey authorized to charge fees to recover "direct costs" of providing services); § 23–60–306(3)(e), 9 C.R.S. (1988) (identifying source of payment of "direct costs" of certain training programs); § 24–34–105(2)(a), 10A C.R.S. (1988) (budget requests and adjusted fees of certain boards and commissions shall reflect "direct and indirect costs"); § 25–2–121(2)(b)(I), 11A C.R.S. (1989) (budget request and adjusted fees of state registrar of vital statistics to reflect "direct and indirect costs"); § 24–113–104(1)(a), 10B C.R.S. (1988) (bid by institution of higher education to provide certain goods or services shall include "all direct and indirect costs" of providing such goods or services); *see also Commercial Federal Sav. and Loan Ass'n v. Douglas County,* 867 P.2d at 19. Although these statutes do not address the subject of property tax assessment, they do include language regarding recoupment of direct and indirect costs. The legislature clearly understood that costs generally can be classified as either direct or indirect. Given the standard understanding within the real estate industry of the scope of the term "cost of development" in regard to valuing vacant land, we are confident that if the legislature had intended to limit consideration of costs of development to direct costs it would have used the term "direct costs of

development" in section 39–1–103(14)(b) as it appeared prior to the 1992 amendment.

### C.

Douglas County asserts that the legislative history of section 39–1–103(14)(b), both as originally enacted and as amended in 1992, bolsters its interpretation of the term "cost of development." Douglas County refers to the testimony of Mary Ann Maurer, the property tax administrator, during a hearing on S.B. 88–184 before the House Committee on Finance when section 39–1–103(14)(b) was first considered for adoption.[10] *Transcript of Hearing on Senate Bill 88–184 Before House Committee on Finance,* 56th General Assembly, 2d. Sess. 48 (May 9, 1988) (hereinafter *Hearing on S.B. 88–184* ). Douglas County argues that during this testimony Maurer referred only to direct costs of development in her description of the bill. *Hearing on S.B. 88–184* at 57–61. Therefore, Douglas County contends that the drafters of the bill intended deduction of only direct costs of development.

In construing a statute, our primary task is to determine and give effect to the intent of the General Assembly. *Kern v. Gebhardt,* 746 P.2d 1340, 1344 (Colo.1987). To discern that intent, we look first to the language of the statute itself and then give effect to the statutory terms in accordance with their commonly accepted meaning. *Id.* If the language of the statute is ambiguous, however, it is "appropriate to look to the pertinent legislative history in determining which construction is in accordance with the objective sought by the legislature." *General Elec. Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo.1994); *accord* § 2–4–203(1)(c), 1B C.R.S. (1980). Thus, the legislative history of a statute can be instructive as to the legislature's intent when the statute itself is unclear. *See, e.g., City of Aspen v. Meserole,* 803 P.2d 950, 953–955 (Colo.1990).

Mary Ann Maurer's testimony before the House Committee on Finance in 1988 provides little assistance in resolving the issue

---

**10.** S.B. 88–184 is the bill that originally enacted subsection 39–1–103(14)(b), including "cost of development" as one of the factors to be taken into account by assessing officers in valuing va-

cant land by the market approach. Ch. 268, sec. 4, § 39–1–103(14)(b), 1988 Colo.Sess.Laws 1276, 1281.

before us. *Hearing on S.B. 88–184* at 57–61. Although she referred only to direct costs of development during her description of the effect of S.B. 88–184, she did not offer a definition of the term "cost of development." *Id.* Her description of certain direct costs was given as an example of why proper assessment requires deduction of development costs in general. We do not read her testimony as intended to provide the General Assembly with a comprehensive understanding of the term "cost of development." During the hearing on S.B. 88–184, there was little other discussion of the term "cost of development" despite the fact that a real estate industry representative told the senators that the term "cost of development" was not clearly defined in the Bill. *Hearing on S.B. 88–184* at 19–20.

Douglas County also argues that hearings before the Senate Committee on Local Government and the House Committee on Finance regarding S.B. 92–101, which is the source of the 1992 amendment to section 39–1–103(14)(b), indicate a legislative intent to clarify the term cost of development rather than to change it. We discover no clear indication of such an intent in the records of the hearings.

Only Representative Foster, one of the bill's sponsors, indicated an intent to clarify the term "cost of development" as it appeared in the pre-amendment version of section 39–1–103(14)(b).[11] However, Senator Rizzuto—also a sponsor of the bill—indicated that the 1992 amendment to section 39–1–103(14)(b) represented a "total rewrite" of the section. He stated:

> Now, the vacant land piece, the way it's structured, it's a *total rewrite* of the vacant land section. I have an amendment that would change that so we capture those soft costs; so soft costs could not be discounted as they are now, ...

*Transcript of Hearing on Senate Bill 92–101 Before Senate Committee on Local Government,* 58th General Assembly, 2d Sess. at 9 (Feb. 13, 1992) (emphasis added). Senator Rizzuto's statement indicates an intent to change section 39–1–103(14)(b) in order to capture indirect or soft costs. Besides the statements of Senator Rizzuto and Representative Foster, no other member of the General Assembly addressed the issue of whether the legislature originally intended to allow deductions for indirect costs in enacting S.B. 88–184.

During the Senate Committee hearing on S.B. 92–101, the senators were concerned mainly with the need to increase mill levies and the attendant relative shifts in the burden of taxation to other classes of real property if indirect costs continued to be deducted in assessing vacant land. *Id.* at 5–11, 15–18. This issue was brought to the General Assembly's attention after the court of appeals' decision in *Fairfield–Pagosa, Inc. v. Archuleta County Bd. of Equalization,* Case Nos. 89CA1334 and 89CA1587 (Colo.App. Jan. 24, 1991) (not selected for official publication).[12] The legislative history of S.B. 92–

---

**11.** Representative Foster stated:

> ... as you know, we allow vacant land to be stretched over a period of time and discounted based on a period of time, on how long it's going to take you to sell, which I think is fair, allowing them to further deduct so-called soft costs, administrative costs, etc., what [sic] I don't think is in the statute, somehow the court felt it was; and this bill in Section 1 would remove that or disallow the deductibility [sic] of soft costs.

*Transcript of Hearing on Senate Bill 92–101 Before House Committee on Finance,* 58th General Assembly, 2d Sess. at 2 (March 5, 1992).

**12.** The Colorado Court of Appeals in *Fairfield–Pagosa, Inc.,* without discussion, interpreted the term "cost of development" in the version of section 39–1–103(14)(b) in effect prior to the 1992 amendment to authorize deduction of indirect costs in valuing vacant land for property tax

assessment purposes. After this decision, the county assessors and the BAA routinely adjusted for indirect costs in valuing vacant land for assessment. *See Land Valuation Manual* at 1.52–1.55; *Commercial Federal Sav. and Loan Ass'n v. Douglas County Bd. of Equalization,* Docket No. 16877 (Feb. 14, 1992) (recognizing adjustments for sales costs, sales commissions, administrative costs, and profit); *First American Title Ins. Co. v. Douglas County Bd. of Equalization,* Docket No. 16876 (Mar. 5, 1992, amended March 13, 1992) (recognizing adjustments for overhead and profit); *Sunbelt Dev. Corp. v. Elbert County Bd. of Equalization,* Docket No. 13854 (Apr. 30, 1991) (adjusting retail price for overhead, sales expense, and profit). We have been unable to discover from the record or from other available sources any reliable indication of how assessors treated indirect costs prior to the court of appeals' decision in *Fairfield–Pagosa, Inc.*

101 indicates an intention on the part of the legislature to abolish deduction of indirect costs as part of the process for assessment of vacant land. There is, however, no clear statement as to the intent of the legislature regarding the meaning of the term "cost of development" in section 39–1–103(14)(b) as it existed before the 1992 amendment. Because the legislative history of S.B. 92–101 does not exhibit a clear intent to clarify the term "cost of development" in the pre-amendment version of the statute, we conclude that the 1992 amendment of section 39–1–103(14)(b) effected a change, not a clarification. As a result, the version of the statute in effect in 1991 required consideration of indirect costs during the valuation process.

### D.

Douglas County also argues that policy reasons support an interpretation of the term "cost of development" in the pre-amendment version of section 39–1–103(14)(b) to exclude indirect costs. Douglas County contends that indirect costs are highly variable and subjective. Inclusion of indirect costs in the assessment process, according to Douglas County, will lead to inconsistent valuations and unfair taxing practices. Further, Douglas County maintains that the market approach already takes into account indirect costs. Allowing indirect costs to be deducted in the assessment process, the argument proceeds, will lead to a double deduction. We disagree with Douglas County's contentions.

Section 2–4–203(1)(e), 1B C.R.S. (1980), allows the court in determining the intention of the General Assembly when interpreting an ambiguous statute to consider the consequences of a particular construction. *See also State Engineer v. Castle Meadows, Inc.*, 856 P.2d 496, 504–506 (Colo.1993); *Woodsmall v. Regional Transp. Dist.*, 800 P.2d 63,

67 (Colo.1990). Therefore, policy considerations can be relevant to the proper interpretation of section 39–1–103(14)(b). We conclude, however, that Douglas County's contention that requiring deduction of indirect costs will lead to inaccurate valuations is unpersuasive.

Allowing deduction of indirect costs does not promote a lack of uniformity regarding valuation as Douglas County suggests. Assessors must make a complex set of calculations when determining land values for taxation purposes. *See Land Valuation Manual* at 1.19–1.85. The Property Tax Administrator through publication of the *Land Valuation Manual* can provide assessors with instruction and guidelines to ensure that the assessors are properly valuing property. Indirect costs do not pose a significantly more difficult problem for assessors than do direct costs. A developer or property owner must provide assessors with documentation to support the amount and reasonableness of indirect costs just as for direct costs. *See Land Valuation Manual* at 1.53—1.54.[13] The assessor will then scrutinize indirect costs just as the assessor scrutinizes direct costs. *See id.* at 1.54. In addition, the BAA and the court of appeals have the power to review the assessor's determination and ensure that valuations are fair and consistent. § 39–8–108, 16B C.R.S. (1994).

Furthermore, we are not persuaded that a double deduction will result from allowing deduction of indirect costs during the valuation process. We see little distinction between deduction of indirect costs and direct costs of development. We fail to understand how deduction of indirect costs would result in a double deduction; but, deduction of direct costs would not.

Douglas County's double deduction argument is based on the use of the term "market

---

**13.** The *Land Valuation Manual* describes the process to be followed to ascertain and corroborate soft costs:

Only costs that can be documented should be allowed. In the absence of specific verified developer costs, a general soft cost percentage deduction may be allowed. However, no deduction should be given unless adequate documentation exists to support the deduction. General soft costs percentage deductions must

be derived from directly comparable developments where development costs have been verified. The use of general percentage deductions must be used with caution since developers typically do not incur identical development costs. Assessors must make a special effort to contact all developers to determine their development costs expenditures.

*Land Valuation Manual* at 1.54.

approach to appraisal" to describe two different appraisal methods. The first, described in general above, is the present worth discount method in which development costs are deducted when determining an adjusted retail price for the parcel. *See supra* p. 4; *see also Craddock,* 850 P.2d at 705–06. Such costs are deducted because the unadjusted retail price is based on the value of developed lots—those that have been subdivided and prepared for sale. The unadjusted retail price of the vacant land reflects the cost to develop and market the property to potential buyers. By subtracting the cost of development, assessors arrive at the value of the vacant land itself without improvements. Under this method of appraisal, subtraction of the cost of development from the unadjusted retail price results in only a single, appropriate deduction.

The second appraisal method determines the value of vacant land by use of comparable sales of vacant land in bulk—typically in a sale by one potential developer to another. *See Craddock,* 850 P.2d at 703–04, 707–08 (recognizing difference between determination of market value based on comparable sales of vacant land in bulk and the determination of market value based on present worth discounting of subdivided parcels in a tract). The sales prices in comparable sales of vacant land in bulk are already discounted to reflect the buyer's estimation of the costs a buyer would incur to develop and market the property for sale. If development costs, direct or indirect, were to be deducted after utilizing the comparable bulk sales method to ascertain value, a double deduction would result. In each of the cases before us, the assessor used the first market approach described above · and the present worth discounting method to determine the value of the properties. Thus, consideration of indirect costs would not have resulted in a double deduction or an inaccurate valuation.

E.

■ Both Douglas County on the one hand and Roxborough and Castle Pines on

the other refer to the provisions of the 1991 version of the *Land Valuation Manual* in an effort to support their respective views regarding proper consideration of indirect costs under section 39–1–103(14)(b) as it existed before the 1992 amendment. We have held that when construing statutes, courts should give appropriate deference to an administrative agency's interpretation of a statute. *Craddock,* 850 P.2d at 704–705; *Howard Elec. and Mechanical, Inc. v. Department of Revenue,* 771 P.2d 475, 478–479 (Colo.1989). Administrative interpretations are especially useful when the statute involves a technical subject and the agency possesses expertise in the area. *Craddock,* 850 P.2d at 705. Nevertheless, agency interpretations are not binding on this court. *Id.* at 704–705; *Colo. Div. of Employment and Training,* 725 P.2d at 790–791.

Both Douglas County and the Roxborough and Castle Pines parties cite to page 7.48 of the 1991 version of the *Land Valuation Manual.* This page discusses the use of soft costs when calculating the adjusted selling price under the "developmental cost method." Our reading of that reference yields no reliable assistance in determining the administrative position on use of indirect costs for the purposes at issue here. Nor have we discovered any reliable guidance elsewhere in the regulations regarding proper treatment of direct or indirect costs during the assessment process.[14]

In its January 24, 1991, unpublished opinion in *Fairfield–Pagosa, Inc.,* the court of appeals affirmed a BAA decision allowing consideration of indirect costs during the vacant land valuation process. *See supra* p. 22, n. 12. The BAA has the authority and the responsibility for reviewing county board of equalization valuation decisions. § 39–2–125(c), 16B C.R.S. (1994); § 39–8–108(1), 16B C.R.S. (1994). Therefore, the BAA's interpretation of property tax statutes provides some evidence of the proper technical analysis of issues relating to property taxation. In *Fairfield–Pagosa, Inc. v. Archuleta*

---

14. The regulations were revised in early 1992 after the Colorado Court of Appeals' decision in *Fairfield–Pagosa, Inc. See supra,* at 22 n. 12.

Our previous citations to the *Land Valuation Manual* in this opinion refer to the revised edition presently in effect.

*County Board of Equalization,* Docket No. 12068 (Aug. 22, 1991), the BAA stated:

> The Board [BAA] found that the costs, soft and hard, should be deducted on the unsold lots; however, only the hard costs should be deducted on the lots under contract. It is unreasonable to assume that a potential purchaser would buy the subject properties for the future market value discounted for *time only,* without giving consideration of the costs necessary to market the lots, cover overhead expenses, install physical items such as roads and electricity, and receive some degree of profit. Standard appraisal practices call for the deduction of the costs.

*Id.* at 4 (emphasis in original). Thus, prior to the court of appeals' decision in *Fairfield–Pagosa, Inc.* the BAA had already analyzed the issue and concluded that determination of the "actual value" of vacant land, as mandated by section 39–1–103(14)(b), required consideration of indirect costs. Furthermore, until its ruling in the *Castle Pines* case, the BAA consistently allowed deduction of indirect costs when reviewing valuations of vacant land for property tax assessment purposes. *See supra* p. 22 n. 12. These rulings give some indication of both administrative practice and the proper technical analysis of how "actual value" should be determined under section 39–1–103(14)(b) as it existed prior to the 1992 amendment. The BAA decisions further reinforce our view that the proper construction of the term "cost of development" in section 39–1–103(14)(b) prior to the 1992 amendment required consideration of both direct and indirect costs.

### IV.

In summary, we hold that the term "cost of development" in section 39–1–103(14)(b), prior to the 1992 amendment, encompasses both direct and indirect costs of development. In addition, we hold that the 1992 amendment to section 39–1–103(14)(b) changing the term "cost of development" to "direct costs of development" and specifically disallowing de-

duction of indirect costs of development, such as marketing, overhead, and profit, was a change to the statute and not a clarification.

Therefore, we affirm the judgments of the Colorado Court of Appeals in both cases and uphold its determinations that section 39–1–103(14)(b) prior to the 1992 amendment required assessors to consider indirect costs when valuing vacant land pursuant to the market approach for purposes of property tax assessment.