David MARTIN and Rebecca Martin, parents and next friends to Maureen Martin, a minor and incapacitated person, Plaintiffs–Appellees and Cross–Appellants,

v.

UNION PACIFIC RAILROAD COMPANY, a foreign corporation and Dannie Dolan, individually, Defendants–Appellants and Cross–Appellees.

No. 05CA1917.

Colorado Court of Appeals, Div. VI.

Sept. 20, 2007.

Schuetze & Gordon, L.L.P., Robert A. Schuetze, Glen F. Gordon, Boulder, Colorado; Hale Friesen, L.L.P., Allan L. Hale, Richard A. Westfall, Peter J. Krumholz, Shayne M. Spalten, Denver, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Steven E. Napper, Mark C. Hansen, Alice M. De Stigter, Denver, Colorado; Hall & Evans, L.L.C., Alan Epstein, Denver, Colorado, for Defendants–Appellants and Cross–Appellees.

Levy Morse & Wheeler, P.C., Karen H. Wheeler, Brian J. Waters, Joshua O. Gregory, Englewood, Colorado, for Amicus Curiae Colorado Defense Lawyers Association.

Opinion by Judge WEBB.

This Premises Liability Act, § 13–21–115, C.R.S.2007 (the Act), case arises from a collision between a train and a car at a grade crossing. Defendants, Union Pacific Railroad Company (Union Pacific) and Dannie Dolan, the engineer, appeal the judgment entered on a jury verdict in favor of plaintiffs, David and Rebecca Martin, parents and next friends of Maureen Martin (Martin), the driver of the car. Plaintiffs cross-appeal the trial court's order declining to increase the exemplary damages awarded by the jury. We affirm the judgment, affirm the order in part and reverse it in part, and remand for further proceedings.

## I. Facts

Union Pacific owned and maintained the crossing where the accident occurred. Martin drove onto the crossing, the train approached, the warning lights began to flash, the automatic gate came down hitting Martin's car, and the train sounded its whistle. Martin neither drove her car off the crossing nor exited the car. Martin's then boyfriend, Vincent Veruchi, who was behind her in his truck, attempted to push her car by ramming into the back of it. The train struck Martin's car, causing her serious injuries.

Defendants presented evidence that had Martin's car stayed where it was before being pushed by Veruchi's truck, the train would not have hit it. Their evidence also indicated that Martin had about twenty seconds to either back off of the crossing or exit the car.

According to plaintiffs' evidence, the car stalled at the crossing before the train came into view, but Martin was unable to restart it. The car was either on the tracks or so near them that the train crew could not have known whether they were going to hit her. Their evidence suggested that although the train crew saw Martin's car, the train continued at maximum authorized operating speed, but by applying the emergency brake the crew could have stopped the train before the collision.

The jury awarded actual damages of $7,147,120 to Martin, actual damages of $615,714 to her parents, and $4,000,000 in punitive damages.

## II. Affirmative Defenses

Defendants first contend the trial court erred by striking their affirmative defenses under sections 13–21–111 (comparative negligence) and 13–21–111.5 (pro rata liability), C.R.S.2007. We review this issue de novo, *People v. Renander*, 151 P.3d 657, 659 (Colo. App.2006), and we agree with the trial court, but for a different reason—an amendment to the Act enacted after this case had been tried.

### A. *Vigil v. Franklin*

Relying on *Vigil v. Franklin*, 103 P.3d 322 (Colo.2004), the trial court concluded as a matter of law that these defenses do not apply under the Act. We read *Vigil* as limited to duty issues.

Vigil sought damages for injuries suffered when he dove into an above-ground pool on the Franklins' property. The Franklins argued that "they owed no duty of care to Vigil because diving into an above-ground pool was an open and obvious danger." *Id.* at 324.

The supreme court considered "Colorado's premises liability statute in determining whether the Franklins owed Vigil a legal duty." *Id.* at 325. It framed the issue as "whether common law defenses to landowner duties, such as the open and obvious danger doctrine, still exist" under the Act. *Id.* at 324.

The Act states:

In *any* civil action brought against a landowner by a person who alleges injury occurring while on the real property of another ... the landowner shall be liable *only* as provided in subsection (3) of this section.

§ 13–21–115(2) (emphasis added). Subsection (3) sets forth the standards under which a trespasser, a licensee, and an invitee may recover damages. The 1990 version of the Act—at issue in *Vigil* and applied by the trial court here—did not address defenses.

The *Vigil* majority concluded that "the express, unambiguous language of the [Act] evidences the General Assembly's intent to establish a comprehensive and exclusive specification of the duties landowners owe to those injured on their property," *Vigil*, 103 P.3d at 323, which "leaves no room for application of common law tort duties." *Id.* at 328. Thus, "[w]hile a landowner may argue that he owes no duty to an injured plaintiff, he may do so only pursuant to the defenses set forth in the statute." *Id.* at 331.

According to the majority, a statutory defense under the Act to a landowner's duty is "[s]tructurally ... independent of and arises before other recognized negligent tort defenses such as contributory negligence and comparative fault." *Id.* at 325. The majority expressed no opinion on the viability of these other defenses, but concluded that the General Assembly had "abrogated the common law regarding defenses to the existence of such duties." *Id.* at 330.

Based on this distinction between common law defenses to a landowner's duty and other

defenses that do not affect such a duty, we conclude that *Vigil* simply does not address application of the affirmative defenses under sections 13–21–111 and 13–21–111.5. *See Painter v. Inland/Riggle Oil Co.,* 911 P.2d 716, 719 (Colo.App.1995) (their purpose is to "apportion damages more equitably among those who caused the losses"), *aff'd,* 925 P.2d 1083 (Colo.1996). This reading is consistent with the grant of certiorari in *Vigil* to consider "whether the common law open and obvious danger doctrine survived enactment of Colorado's premises liability statute." *Vigil,* 103 P.3d at 324 n. 2.

Because in our view *Vigil* is not directly on point, we consider principles of statutory interpretation to determine whether the affirmative defenses in sections 13–21–111 and 13–21–111.5 applied under the 1990 version of the Act.

In 2006, after this case had been tried, the General Assembly added the following language to section 13–21–115(2): "Sections 13–21–111, 13–21–111.5, and 13–21–111.7 shall apply to an action to which this section applies." Because we conclude that this amendment is dispositive and leads to the same result reached by the trial court, we do not address decisions of other divisions of this court that predated the amendment. *See Pedge v. RM Holdings, Inc.,* 75 P.3d 1126 (Colo.App.2002) (defendant in premises liability action permitted to designate nonparty at fault, but plaintiff did not assert that the Act precluded such designation); *Thornbury v. Allen,* 991 P.2d 335 (Colo.App.1999) (landowner's comparative negligence defense mentioned but not questioned).

### B. Statutory Interpretation Principles

■ Statutory interpretation is a question of law that we review de novo. When construing a statute, our primary task is to give effect to the General Assembly's intent. *Bostelman v. People,* 162 P.3d 686, 689 (Colo. 2007).

■ We initially rely on the language of the statute, giving words and phrases their plain and ordinary meaning, unless a plain language interpretation would lead to an absurd or unreasonable result. *Id.* at 690.

However, if a statutory provision is ambiguous or silent regarding the matter at issue, we interpret it to reflect the General Assembly's intent. *Buckley v. Chilcutt*, 968 P.2d 112, 117 (Colo.1998); *see also Williams v. White Mountain Constr. Co.*, 749 P.2d 423, 428 (Colo.1988) ("In the face of statutory silence, questions of interpretation are governed by legislative intent."). To divine that intent, we look to the statute's legislative history. *Robbins v. People*, 107 P.3d 384, 389 (Colo.2005) (examining legislative history because of statutory silence).

Here, we do not consider the legislative history of the 1990 version because the General Assembly has indicated its intent concerning that version by adding language in 2006 which allows a landowner to assert the defenses at issue. Instead, we examine this amendment to determine whether the General Assembly intended to change or merely to clarify the 1990 version. *See Frank M. Hall & Co. v. Newsom*, 125 P.3d 444, 451 (Colo. 2005) (examination of subsequent amendments to ambiguous legislation); *cf. City of Bloomington v. Illinois Labor Relations Bd.*, 373 Ill.App.3d 599, 606, 313 Ill.Dec. 25, 871 N.E.2d 752, 759 (2007) ("It is proper for a court to consider a subsequent amendment to a statute to determine the legislative intent behind and the meaning of the statute prior to the amendment." (quoting *Chiczewski v. Emergency Tel. Sys. Bd.*, 295 Ill.App.3d 605, 608, 229 Ill.Dec. 702, 692 N.E.2d 691, 694 (1997))).

When the General Assembly amends a statute, an intent to change it is presumed. *City of Colorado Springs v. Powell*, 156 P.3d 461, 465 (Colo.2007). This presumption can be rebutted by evidence that the amendment was intended only to clarify an ambiguity in the statute. *Acad. of Charter Schs. v. Adams County Sch. Dist. No. 12*, 32 P.3d 456, 464 (Colo.2001).

Thus, if the General Assembly intended merely to clarify the 1990 version with this amendment, then we must conclude that defendants could have asserted these defenses at the time of the accident. But if the General Assembly intended to change the 1990 version with this amendment, then we must conclude that defendants were foreclosed from asserting these defenses.

To distinguish between a change and a clarification, we look to (1) whether the provision was ambiguous before it was amended; (2) the plain language used in the amendment; and (3) the legislative history surrounding the amendment. *City of Colorado Springs v. Powell*, 156 P.3d at 465. Applying this three-part analysis, we conclude that the presumption of an intent to change has not been overcome by evidence showing that the amendment was intended only as a clarification.

### C. Application

#### 1. Ambiguity

Initially, we note that neither party asserts the 1990 version was ambiguous. However, the parties come to diametrically opposite conclusions from the same language concerning the viability of affirmative defenses. Further, an appellate court is not bound by concessions of the parties. *People v. Backus*, 952 P.2d 846, 850 (Colo.App.1998). Hence, we make our own determination of ambiguity.

The 1990 version was silent on whether a landowner liable under subsection (3) could assert the affirmative defenses created by sections 13–21–111 and 13–21–111.5 to reduce recoverable damages. On the one hand, the broad scope of the Act's language as noted in *Vigil* favors preclusion of these defenses because they are not referenced in the Act. On the other hand, although the General Assembly is presumed to have knowledge of other legislation, *see Leonard v. McMorris*, 63 P.3d 323, 331 (Colo.2003), the Act does not preclude application of defenses in other statutes. And the broad wording of the affirmative defense in section 13–21–111.5, which applies to "any civil action," disfavors preclusion.

Either interpretation would be reasonable. A statute subject to more than one reasonable interpretation is ambiguous. *Estate of David v. Snelson*, 776 P.2d 813, 817 (Colo.1989). Thus, we conclude that the 1990 version is ambiguous. However, ambiguity

is not dispositive of the intent to clarify rather than to change.

In *Douglas County Board of Equalization v. Fidelity Castle Pines, Ltd.*, 890 P.2d 119, 125 (Colo.1995), the supreme court held that a subsequent amendment was a change in the law, despite ambiguous pre-amendment statutory language. The court explained that it "found an amendment to be a clarification only in those situations where legislative history or the language of the statute clearly indicates an intent to clarify." *Id.* Hence, we examine those factors in turn.

### 2. Legislative History

The legislative history of the amendment is inconsistent and therefore does not establish an intent to clarify.

The bill summary states that the amendment "[c]larifies the applicability of certain statutory provisions in premises liability actions." Bill Summary on H.B. 06–1237 to House Judiciary (Feb. 10, 2006). Similarly, the fiscal note states, "This bill clarifies a landowner's or landholder's tort liability for conditions or activities on his or her premises." Colo. Legislative Council Staff, Fiscal Note on H.B. 06–1237 to House Judiciary (Feb. 10, 2006).

At a hearing before the Senate Judiciary Committee, Senator Dyer, a co-sponsor, stated that "[t]his clarifies the pre-statutory defenses of comparative negligence, third party at fault and assumption of the risk." Hearings on H.B. 06–1237 before the Senate Judiciary Committee, 65th Gen. Assemb., 2d Sess. (Mar. 14, 2006). Later in the hearing, a representative from the Colorado Defense Lawyers Association stated that the purpose of the bill "is to make sure in Title 5 that the statutory defenses of comparative negligence, assumption of the risk are still to be considered part of the premises liability statute." *Id.* (testimony of Jeff Ruebel).

In contrast, before the House Judiciary Committee, the other co-sponsor of the bill explained:

> [T]he purpose of this bill is to reinstate statutory defenses for landowners and premises liability actions in light of the Colorado General Assembly's 1990 amendments to the premises liability act and the Colorado supreme court decision of *Vigil v. Franklin* interpreting those amendments.

Hearings on H.B. 06–1237 before the House Judiciary Committee, 65th Gen. Assemb., 2d Sess. (Feb. 16, 2006) (testimony of Rep. Carroll). He added that the bill "does one simple thing: it reinstates in the statute all the common law defenses available previously prior to the enactment of the 1990 statute." *Id.*

At the same hearing, a Colorado Trial Lawyers Association representative stated that the "General Assembly preempted defenses that landowners previously enjoyed as the Colorado supreme court recognized in *Vigil* ... and so, [this bill] does reinstate the statutory defenses of comparative negligence, third party at fault and assumption of the risk." *Id.* (testimony of Robert Schuetze).

The "testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent." *Vensor v. People*, 151 P.3d 1274, 1279 (Colo. 2007). But here, the co-sponsors' statements are in conflict, as are other aspects of the legislative history. Hence, the legislative history does not overcome the presumption that the amendment was intended to change the 1990 version.

### 3. Amendatory Language

The wording of the amendment suggests a change rather than a clarification.

In *Corsentino v. Cordova*, 4 P.3d 1082, 1091 (Colo.2000), the supreme court concluded that the phrase "shall *continue to* apply" used in an amendment indicated a clarification of the prior law rather than a change.

Unlike *Corsentino*, here the amendment uses more contemporaneous language, "shall apply." Likewise, the effective date language—"shall apply to causes of action accruing on or after the effective date of this act"—suggests a prospective change rather than a retrospective clarification. Ch. 107, sec. 2, 2006 Colo. Sess. Laws 344.

▮▮▮ The General Assembly is presumed to be aware of prior relevant case law when amending a statute. *People v. Bur-*

*gess,* 946 P.2d 565, 568 (Colo.App.1997). "When an amendment closely follows judicial decisions interpreting a statute and the plain meaning of the amendatory language modifies the statute as previously construed," the presumption that the General Assembly intended to change the law strengthens. *Id.* Thus, passage of the amendment in direct response to *Vigil* also suggests an intent to change the law, even though some of the legislative history indicates a broader reading of *Vigil* than ours.

In sum, because neither the legislative history nor the plain language of the amendment shows an intent to clarify, we conclude that the presumption—the 2006 amendment adding the affirmative defenses in sections 13–21–111, 13–21–111.5, and 13–21–111.7 to the Act was a change in the law—has not been rebutted.

■ In so holding, we recognize that our interpretation of the 1990 version is harsh to landowners, who cannot reduce their liability based on either the negligence of persons coming onto their land or the fault of nonparties. However, this result is neither unreasonable nor absurd, *see* § 2–4–201(1)(c), C.R.S.2007 ("[a] just and reasonable result is intended"), because section 13–21–115(3) makes the landowner liable based only on various causation principles, which depend on the status of the claimant. *Anderson v. Hyland Hills Park & Recreation Dist.,* 119 P.3d 533, 535 (Colo.App.2004). Further, policy judgments are the exclusive province of the General Assembly. *See, e.g., Town of Telluride v. Lot Thirty–Four Venture, L.L.C.,* 3 P.3d 30, 38 (Colo.2000) ("It is not up to the court to make policy or to weigh policy.").

Accordingly, we further conclude that the trial court did not err in striking defendants' affirmative defenses.

### III.  Federal Preemption

■ Defendants next contend the trial court erred in admitting testimony concerning dangers of the crossing that they assert was preempted under the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101–20117. We disagree.

■ Federal preemption of state law is subject to de novo review. *Kohn v. Burlington N. & Santa Fe R.R.,* 77 P.3d 809, 811 (Colo.App.2003).

■ A trial court has considerable discretion in deciding the admissibility of evidence, and an abuse of that discretion occurs only when its ruling is manifestly arbitrary, unreasonable, or unfair. *Scott v. Matlack, Inc.,* 39 P.3d 1160, 1170 (Colo.2002).

The FRSA authorizes the Secretary of Transportation to promulgate regulations and issue orders for railroad safety, and it requires the Secretary to maintain a coordinated effort to solve grade crossing problems. *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 347, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) (*Shanklin I* ).

The Secretary has promulgated several regulations related to grade crossings, including 23 C.F.R. § 646.214(b)(3) and (4), which set forth guidelines for selecting the appropriate warning devices to be installed at grade crossings improved with federal funding.

■ Under the FRSA, to preempt state law the federal regulation must "cover" the same subject matter, and not merely " 'touch upon' or 'relate to' that subject matter." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The Supreme Court held that subsections 646.214(b)(3) and (4) "cover the subject matter of state law which ... seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings." *Id.* at 671, 113 S.Ct. 1732. Thus, once states "have installed federally funded devices at a particular crossing [they may not] hold the railroad responsible for the adequacy of those devices." *Shanklin I,* 529 U.S. at 358, 120 S.Ct. 1467.

However, in *Strozyk v. Norfolk Southern Corp.,* 358 F.3d 268, 275 (3d Cir.2004), the court explained:

[N]either [*Easterwood* nor *Shanklin I* ] speaks of supplanting the negligence regime of the fifty states; nor do these cases intimate that they are relieving railroads of any and all state duties of care with respect to grade crossing safety in gener-

al.... [I]t would be odd indeed if the Court intended its construction of § 646.214 to entirely displace state law assuring safety at grade crossings, separate and apart from the adequacy of warning devices.

The court concluded, "the ambit of § 646.214(b) is limited to the adequacy of warning devices, nothing more." *Strozyk*, 358 F.3d at 276.

Similarly, in *Shanklin v. Norfolk Southern Railway Co.*, 369 F.3d 978, 988 (6th Cir.2004) (appeal from retrial following *Shanklin I*) *(Shanklin II )*, the court concluded:

> While, as *Easterwood* and *[Shanklin I]* make clear, §§ 646.214(b)(3) and (4) substantially altered the landscape of railroad liability, by restricting tort plaintiffs from interposing state law obligations concerning appropriate warning devices, the regulations do not eclipse those duties ensuring safe grade crossings that are unrelated to warning devices....

*Id.* (quoting *Strozyk*, 358 F.3d at 276–77).

We begin the preemption analysis by adopting the reasoning in *Strozyk* and *Shanklin II*, and turn to whether the trial court abused its discretion under this standard.

Defendants assert that because federal funds were used to upgrade the warning devices at the crossing, opinion testimony by plaintiffs' expert about the dangers from the adjacent intersection was inadmissible. But the only testimony that they point to in support of their contention is the expert's discussion of the traffic flow at that intersection and the resulting "need to stop" at the crossing.

We discern no abuse of discretion in the trial court's determination that this testimony was not preempted because the expert did not opine on the adequacy of the warning devices at the crossing. Hence, the expert testimony is not controlled by *Shanklin I*, 529 U.S. at 347, 120 S.Ct. 1467 (holding FSRA preempted claim that "warning signs posted at the crossing, which had been installed using federal funds, were insufficient to warn motorists of the danger posed by passing trains").

Accordingly, we conclude that the trial court did not err in admitting the expert's testimony.

## IV. Martin's Status

■ Defendants next contend the trial court erred in determining that Martin was an invitee under section 13–21–115(5)(a) rather than a trespasser under section 13–21–115(5)(c), and instructing the jury accordingly. We disagree.

Under the Act, "the judge shall determine whether the plaintiff is a trespasser, a licensee, or an invitee" at the time of the injury. § 13–21–115(4). An invitee is a person "who enters or remains on [the land of another] in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain. § 13–21–115(5)(a). A "trespasser" is "a person who enters or remains on the land of another without the landowner's consent." § 13–21–115(5)(c).

■ We review this determination as a mixed question of fact and law. We defer to the trial court's credibility determinations and will disturb its findings of historical fact only if they are clearly erroneous and not supported by the record. But we review de novo the court's application of the governing statutory standards. *Chapman v. Willey*, 134 P.3d 568, 569 (Colo.App.2006).

The parties cite no Colorado case, and we have found none, addressing a landowner's revocation of consent for an invitee to be on the land while that person is still on the land. Hence, we consider the Restatement (Second) of Torts. *See Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 79 (Colo. 1998) ("Although the Restatement (Second) of Torts does not have the force of law, we may look to it as a summary of guiding legal principles.").

According to Restatement section 332 comment l:

> The possessor of land is subject to liability to another as an invitee only for harm sustained while he is on the land within the scope of his invitation. Thus an invitee ceases to be an invitee after the expiration

of a reasonable time within which to accomplish the purpose for which he is invited to enter, or to remain.

Further, Restatement section 176 comment c provides:

> [O]ne who enters land pursuant to the possessor's consent and finds himself on the land at the time of the unexpected termination of such consent, does not become a trespasser ... if he thereafter leaves the land in a reasonable manner and within a reasonable time.

The determination of a reasonable time should take into account the surrounding circumstances, including "whether he has continued on the land for some time before learning of the termination, or whether his removal has been delayed by accident." Restatement § 176 cmt. d.

Here, although Martin was an invitee as she entered the grade crossing, defendants argue that her permission was revoked when the warning lights began to flash and the gate came down. At that point, according to defendants, Martin became a trespasser, and she remained a trespasser when the train hit her car. Defendants further assert that whether Martin's car stalled, which could have made her trespass unintentional, is immaterial. We are not persuaded.

The trial court found:

> In this case [Martin] clearly entered with consent.... [T]he issue has to do with her remaining on the land after the gate had come down on top of her car. There's no dispute the gate came down, the train blew its whistle, and the lights were flashing. But there's also nothing to indicate otherwise that [Martin] was trying to remove herself from that circumstance.... Clearly, she is not remaining on the land at that point in time. She's attempting to remove herself from that [sic].

These findings have record support, and thus they are not clearly erroneous.

Defendants' reliance on out-of-state cases that involve invitees who exceeded the geographic scope of consent is misplaced. *See Special Force Ministries v. WCCO Television,* 584 N.W.2d 789 (Minn.Ct.App.1998) (hidden camera investigation beyond scope of consent given to reporter masquerading as employee); *Gladon v. Greater Cleveland Reg'l Transit Auth.,* 75 Ohio St.3d 312, 662 N.E.2d 287 (1996) (passenger exceeded scope of consent when a third party pushed him onto railroad tracks); *Rich v. Tite–Knot Pine Mill,* 245 Or. 185, 421 P.2d 370, 374 (1966) (job applicant on premises to obtain employment exceeded scope of consent by unilaterally performing work before being hired).

Here, Martin's car was where she had consent to be until the warning lights began to flash and the gate came down. Even assuming that Union Pacific's consent was thereby revoked, under the Restatement view Martin had a reasonable time within which to leave Union Pacific's property before becoming a trespasser. *Cf. Sammons v. Am. Auto. Ass'n,* 912 P.2d 1103, 1106 (Wyo. 1996) (in revoking the license of one who has entered upon land, the licensor must give the licensee a reasonable opportunity to remove himself).

The trial court made no express finding whether a reasonable period of time had elapsed between Union Pacific's consent being revoked and the train striking Martin's car. However, based on its finding that when the collision occurred Martin "was attempting to extricate herself from the situation and was unable to do so," we conclude that the trial court implicitly found her actions to have been reasonable under the circumstances. *See In re Life Ins. Trust Agreement of Julius F. Seeman,* 841 P.2d 403, 405 (Colo.App.1992) ("Although the court did not make specific findings concerning the conflict of interest issue, such a determination is implicit in its ruling.").

We reject defendants' assertion that under *Gladon v. Greater Cleveland Regional Transit Authority,* whether Martin's trespass was unintentional based on inability to restart her car is irrelevant. *Gladon* did not turn on lapse of a reasonable time to leave the land after consent had been revoked before becoming a trespasser. That calculus of reasonableness would necessarily include the totality of the circumstances, which the trial court recognized in finding that Martin

sought to remove herself from the crossing but "was unable to do so."

We also reject defendants' argument that *Chapman v. Willey*, 134 P.3d 568 (Colo.App. 2006), requires a different conclusion. There, the plaintiff entered motel premises as an invitee to visit a resident, left, and then returned to assault the resident's companion, which made him a trespasser. *Id.* at 569 ("Although permitted to visit the motel for certain purposes, plaintiff became a trespasser when he returned to the motel for the purpose of fighting."). Martin did not leave the grade crossing and return later for a different purpose.

Given our conclusion, we need not address plaintiffs' alternative argument that resolution of the invitee/trespasser issue is irrelevant because the jury found wanton and willful conduct for purposes of punitive damages, which they assert satisfies the "willful and deliberate" standard of a landowner's duty to a trespasser under section 13–21–115(3)(a).

Accordingly, we conclude that the trial court did not err in determining Martin to have been an invitee and so instructing the jury.

## V. Punitive Damages

Defendants next contend the trial court erred in submitting plaintiffs' punitive damages claim to the jury. We disagree.

■ The sufficiency of evidence to justify an award of punitive damages is a question of law. In reviewing this issue, we consider the totality of the evidence viewed in the light most supportive of the verdict. *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo.2005).

Section 13–21–102(1)(a), C.R.S.2007, permits a punitive damages award where, "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."

■ Willful and wanton conduct is defined as "conduct purposefully committed which the actor must have realized was done heedlessly and recklessly without regard to consequences or the rights of the plaintiff." *Coors v. Sec. Life of Denver Ins. Co.*, 112

P.3d at 66; *see* § 13–21–102(1)(b), C.R.S. 2007.

■ Here, plaintiffs presented evidence from which a jury could have concluded that (1) Martin's car stopped either on or extremely close to the tracks, and would have been hit by the train even if Veruchi had not pushed her car from behind; (2) the train crew members had time to stop the train after they first saw Martin's car; (3) the crew members did not use the emergency brake when they first observed Martin's car despite Union Pacific policies requiring them to do so; and (4) Union Pacific had notice of the dangerous condition of the crossing but did nothing to reduce those dangers. When viewed in the light most favorable to the verdict, this evidence supports an award of punitive damages.

Accordingly, we conclude that the trial court did not err in submitting plaintiffs' punitive damages claim to the jury.

## VI. Treble Damages

On cross-appeal, plaintiffs contend the trial court's order declining to treble punitive damages under section 13–21–102(3), C.R.S. 2007, was error. We conclude that further proceedings are required.

Under section 13–21–102(3), the trial court may increase any award of exemplary damages if it is shown that:

(a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case; or

(b) The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

■ A trial court's ruling under section 13–21–102(3) will be disturbed only for an abuse of discretion. *Harvey v. Farmers Ins. Exch.*, 983 P.2d 34, 40 (Colo.App.1998),

*aff'd sub nom. Slack v. Farmers Ins. Exch.,* 5 P.3d 280 (Colo.2000). A trial court abuses its discretion when it applies an incorrect legal standard. *In re Marriage of Sanchez–Vigil,* 151 P.3d 621, 624 (Colo.App.2006).

Here, plaintiffs argue that under section 13–21–102(3)(a), the following testimony of a Union Pacific manager supports treble damages:

Q: Now, you are the management person for the Union Pacific Railroad in charge of this engineer at [the time of the accident], correct?

A: Correct, sir.

Q: And you take no exception to his performance of his duties and the operation of that train as it approached that crossing on November 12, 2002; is that correct?

A: I took no exception, sir.

Q: And sitting here today, you still take no exception to it?

A: Yes, sir.

As to this argument, the trial court found that the manager's testimony was based on "the conduct of the Defendants on the morning of [the accident]," not on conduct during the pendency of the case. And because the manager only approved of the engineer's conduct on the morning of the accident, his testimony did not show defendants had "continued the behavior or repeated the action which is the subject of the claim against the defendant." This finding has support in the record and therefore is not an abuse of discretion.

Plaintiffs also argue that a letter they received from Union Pacific on April 29, 2004, which contained a bill of $594.53 for the railroad's "loss and damage," is further evidence of willful and wanton conduct during the pendency of this case under section 13–21–102(3)(b).

In rejecting this argument, the trial court also applied the "behavior ... which is the subject of the claim" standard in section 13–21–102(3)(a) to the letter plaintiffs received seventeen months after the accident. It found, "The evidence at trial was directed at

the behavior of Defendants on November 12, 2002. The letter ... does not go to this behavior." We conclude the trial court abused its discretion by applying an incorrect legal standard to the letter.

The "subject of the claim" limitation in section 13–21–102(3)(a) does not appear in section 13–21–102(3)(b). Thus, conduct subject to the latter section may warrant an increase of exemplary damages even if that conduct does not relate directly to "the action which is the subject of the claim."

The trial court should have applied section 13–21–102(3)(b) to determine whether by sending the letter, defendants "acted in a willful and wanton manner during the pendency of the action ... which has further aggravated the damages of the plaintiff when the defendant[s] knew or should have known such action would produce aggravation." *See Coors v. Sec. Life of Denver Ins. Co.,* 112 P.3d at 67 (treble damages based on defendant's conduct during the pretrial phase misrepresenting who its decision-makers were and failing to meet its most basic discovery and disclosure obligations).

Accordingly, we reverse the order in part and remand for the trial court to consider the letter and make appropriate findings under section 13–21–102(3)(b). *See Town of Foxfield v. Archdiocese of Denver,* 148 P.3d 339, 347 (Colo.App.2006) (a trial court ruling made with an incorrect legal standard must be reversed and the case remanded to afford the court an opportunity to apply the correct standard to the facts).

The judgment is affirmed, the order on treble damages is reversed as to the claim based on the letter, and the case is remanded with directions to conduct further proceedings as to that claim. In all other respects, the order on treble damages is affirmed.

Judge LOEB concurs.

Justice ROVIRA * dissents.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2007.

Justice ROVIRA dissenting.

I respectfully dissent.

## I.

Contrary to the conclusion of the majority that *Vigil v. Franklin*, 103 P.3d 322 (Colo. 2004), does not resolve the applicability of the statutory affirmative defenses under sections 13–21–111 and 13–21–111.5, C.R.S.2007, and that *Vigil* is not controlling, I am of the opinion it does and is, and the trial court thus erred in striking defendants' statutory affirmative defenses.

I also disagree with the majority's reliance on the 2006 amendment to determine the legislative intent of Colorado's premises liability statute (Act).

My disagreement is based on two factors. First, both parties here agreed that the Act is not ambiguous. Second, even if it were ambiguous, the 2006 amendment did not change the Act, but clarified it.

## II.

In my view, the Act does not abrogate the defenses of comparative negligence and pro rata liability.

The Act as amended in 1990 provides in section 13–21–115(1.5)(d), C.R.S.2007, that the "purpose of this section is also to create a legal climate which will promote private property rights and commercial enterprises and will foster the availability and affordability of insurance." Subsection (1.5)(e) states in part that "its purpose is to protect landowners from liability in some circumstances when they were not protected at common law," and subsection (1.5)(a) states in part that the provisions of the Act were enacted in 1986 "to assure that the ability of an injured party to recover is correlated with his status as a trespasser, licensee, or invitee."

The General Assembly has the authority to modify or repeal the common law, but courts recognize such changes only when they are clearly expressed. Our supreme court has said on a number of occasions that statutes contravening the common law must be strictly construed so that if the legislature wishes to abrogate rights that would otherwise be available under common law, it must state its intent either expressly or by clear implication. *See, e.g., Vaughan v. McMinn*, 945 P.2d 404 (Colo.1997).

The defenses of comparative negligence and pro rata liability were available to landowners when the Act was amended in 1990.

In *Vigil* the supreme court granted certiorari to consider "whether the common law open and obvious danger doctrine survived enactment of Colorado's premises liability statute." *Vigil*, 103 P.3d at 324 n. 2. The court held that the "express, unambiguous language of the statute evidences the General Assembly's intent to establish a comprehensive and exclusive specification of the duties landowners owe to those injured on their property" and that the *common law defenses* to those duties were pre-empted. *Id.* at 323, 328.

Contrary to the view expressed by the majority, *Vigil* abrogated common law defenses to landowner duties but did not rule that statutory defenses were not to be allowed to a landowner.

The *Vigil* court in part II(A), "Creation of Common Law Duties and Defenses," stated that a defendant has the option at common law of arguing that he did not owe a duty to an injured plaintiff. It then pointed out, "Structurally, this argument is independent of and arises before other recognized negligent tort defenses such as contributory negligence and comparative fault. Where a defendant successfully argues no duty, there is no subsequent inquiry into negligence; considering additional defenses under the breach, causation, and damages elements is entirely unnecessary." *Id.* at 325.

Based on my understanding of the issue on which certiorari was granted, *Vigil* spoke to the existence of legal duty and common law defenses in premises liability cases and left other statutory defenses, such as comparative negligence and pro rata liability, untouched.

If the majority is correct in its view that the statutory defenses of comparative negligence and pro rata liability were not available to landowners before the 2006 amendment (H.B. 06–1237), then landowners would

become insurers, because they could be held responsible for damages even for the injuries caused by the negligent acts of persons who come on their lands. In the absence of the defense of nonparty at fault, the landowner could not assign blame, in whole or in part, to another party or, in the absence of the defense of comparative negligence, assign some part of the blame to the person injured.

Comparative negligence is not a defense to any duty element of a negligence claim. It is a creature of statute designed to apportion damages among parties based on the percentage of fault attributable to each party or nonparty.

Although not mentioned in the majority opinion, plaintiff initially brought suit against Vincent Veruchi, alleging that he was negligent and that his negligence caused plaintiff's injuries. Plaintiff then settled her case against Veruchi. The trial court, relying on *Vigil,* ruled that defendants could not apportion fault to Veruchi when it struck defendants' statutory defenses, sections 13–21–111 (comparative negligence) and 13–21–111.5 (pro rata liability).

The majority reads *Vigil* as limited to duty issues. It concluded, "Based on this distinction between common law defenses to a landowner's duty and other defenses that do not affect such a duty, we conclude that *Vigil* simply does not address application of the affirmative defenses under sections 13–21–111 and 13–21–111.5."

Although both parties to this case state (plaintiff in oral argument and both parties in their briefs) that the Act is unambiguous, as did the supreme court in *Vigil,* the majority concludes that it is not bound by the concessions of the parties and that the Act is ambiguous, and therefore it is free to consider legislative history to determine legislative intent. Indeed, the majority does not consider the legislative history of the 1990 version of the Act, which was applicable at the time of the accident in 2002, but it seeks to divine the intent of the legislature by what took place in 2006. By this reasoning it forecloses consideration of decisions of other divisions of this court, and trial courts, both state and federal, which predate the 2006 amendment to the Act.

Because I believe that *Vigil* is controlling and the Act is unambiguous, I consider decisions of other divisions of this court and the trial courts that predated the 2006 amendment upon which the majority rests its opinion.

For example, in *Pedge v. R.M. Holdings, Inc.,* 75 P.3d 1126 (Colo.App.2002), a division of this court in a premises liability case held that unidentified or unknown persons could be designated as nonparties pursuant to Colorado's pro rata apportionment statute, § 13–21–115. *See also Thornbury v. Allen,* 991 P.2d 335 (Colo.App.1999).

In 2005 and 2006, subsequent to the *Vigil* decision, three United States District Court Magistrate judges held in separate premises liability cases that affirmative statutory defenses such as comparative negligence and assumption of the risk were not to be denied to the defendants. *Danielson v. Wal–Mart Stores, Inc.,* (D. Colo. No. 06–cv–00053–EWN–PAC, Mar. 29 & May 1, 2006) (unpublished order accepting magistrate's recommendation as to motion to strike defenses); *Cole v. United States,* (D. Colo. No. Civ. A04CV 1318PACMJW, July 8, 2005) (unpublished memorandum opinion and order); *Rankin v. Union Pac. R.R.,* (D. Colo. No. 04–cv–00372 OES PAC, Sept. 15, 2005) (unpublished order denying motion to strike defenses).

In 2005 in *Means v. Simpson Housing Solutions, LLC,* (Larimer County No. 05CV381), a judge in the District Court of Larimer County held that the defenses of comparative negligence, assumption of the risk, and mitigation of damages were not prohibited to the defendants in a premises liability case, and that such defenses remain in effect after *Vigil.*

In *Donnelly v. Larry H. Miller Corp.,* (Boulder County No. 05CV327), a judge in the District Court of Boulder County held in a premises liability case that the defenses of comparative negligence and assumption of the risk were available to the defendant after *Vigil.*

To the same effect in *Stanek v. Pacific Living Properties,* (Adams County No. 05–

CV–0464), an Adams County District judge denied the plaintiff's motion to strike the defenses of the plaintiff's own negligence, assumption of the risk, and fault of third parties, holding that *Vigil* did not rule that statutory defenses did not apply to premises liability actions.

In three cases in El Paso County and Boulder County District Courts, judges found that assumption of the risk and comparative negligence were not defenses available to defendants in premises liability cases. *Gonzales v. Trout,* (El Paso County No. 04CV3095); *Heil v. Elite Props.,* (El Paso County No. 04CV72); *Tribby v. Grizzard,* (Boulder County No. 04CV763).

The majority ignores these cases which were included with the parties' briefs. None of these courts suggested or held that the Act was ambiguous or that *Vigil* was not controlling. It is only the majority in this case that has come to that conclusion and seeks to resolve that ambiguity by considering the 2006 amendment to the Act.

### III.

Based on the conclusion that *Vigil* is not controlling and the Act ambiguous, the majority begins its journey on statutory interpretation. First it considers the 2006 amendment to the Act, which provided that statutory defenses of comparative negligence, nonparty at fault, and assumption of risk shall apply in premises liability causes of action accruing on or after April 5, 2006.

Second, it states that if a statutory provision is ambiguous "we interpret it to reflect the General Assembly's intent."

Third, to divine that intent, the majority does not look to the premises liability statute that was in force at the time of the accident, but relies solely on the legislative intent expressed in the 2006 amendment.

Fourth, the majority then sets up the proverbial straw man: when a statute is amended, an intent to change is presumed. Having established the presumption of change, it then considers whether the General Assembly meant to change the law or to clarify it.

Assuming for the purposes of this dissent that the 1990 version of the Act was ambiguous and that the 2006 amendment should be considered, I conclude that contrary to the conclusion of the majority, the 2006 amendment was a clarification and not a change of the Act.

Following the format of the majority opinion, I first consider the legislative history of the 2006 amendment.

House Bill 06–1237 was sponsored in the House by Representative Carroll and in the Senate by Senator Dyer. It was assigned to the Judiciary Committee of each body. On the face of H.B. 06–1237, under the title "Bill Summary," there appears the following sentence: "Clarifies the applicability of certain statutory provisions in premises liability actions." The fiscal note also states, "This bill clarifies landowner's or landholder's tort liability for conditions or activities on his or her premises. Since this bill simply clarifies existing law it will not impact the disposition of premises liability cases by the courts. As such, this bill is assessed as having no fiscal impact."

At a hearing before the Senate Judiciary Committee, Senator Dyer, co-sponsor of the amendment, testified that "[t]his clarifies the pre-statutory defenses of comparative negligence, third party at fault and assumption of the risk." Hearings on H.B. 06–1237 before the Senate Judiciary Committee, 65th Gen. Assemb., 2d Sess. (Mar. 14, 2006). Later in the hearing a representative of the Colorado Defense Lawyers Association stated that "[w]hat H.B. 06–1237 does is to make sure in Title 5 that the statutory defenses of comparative negligence, assumption of risk are still to be considered part of the Premises Liability Statute." *Id.*

As noted in the majority opinion, Representative Carrol testified that "the purpose of this bill is to *reinstate* statutory defenses for landowners and premises liability actions" (emphasis added). Also a Colorado Trial Lawyers Association representative stated that H.B. 06–1237 reinstates the statutory defenses of comparative negligence, third party at fault and assumption of risk. Hearings on H.B. 06–1237 before the House Judi-

ciary Committee, 65th Gen. Assemb., 2d Sess. (Feb. 16, 2006).

Based upon its review of the legislative history and its observation that the testimony of a bill's sponsor is powerful evidence of legislative intent, the majority concludes that because the co-sponsors' statements are in conflict, the legislative history does not overcome the presumption that the amendment was intended to change the 1990 version.

I have two basic differences with the majority opinion. First, Senator Dyer, the co-sponsor of the bill, testified that the bill "clarifies the pre-statutory defenses." Second, Representative Carroll's and the Colorado Trial Lawyers Association representative's use of the word "reinstate" clearly demonstrates that the purpose of H.B. 06–1237 was to clarify, not change, the law.

*Webster's New World Dictionary College Edition* defines "reinstate" as follows: "to instate again, restore to a former condition, position." The *American College Dictionary* defines "reinstate" as "to put back or establish again, as in a former position or state." To the same effect, *William C. Burton's Legal Thesaurus* (1980) states that "reinstate" means "[b]ring back, place in a former state, put back in to service an associate concept: reinstate to a job." *Doubleday Roget's Thesaurus* lists the following synonyms for "restore": "reinstate, put back, reinstall, re-elect, reset, reinsert." *Black's Law Dictionary* (8th ed.2004) defines reinstate as "to place again in a former state or position; to restore <the judge reinstated the judgment that had been vacated>."

Giving words their plain and ordinary meaning and applying the dictionary meaning of "reinstate," I believe it is appropriate to conclude that Representative Carroll was saying that statutory defenses were included in the Act as it existed in 1990. Certainly if the statutory defenses were not included in the Act then, they could not be reinstated. If they were included, then of course they could be reinstated, restored, or put back. In short, if they were not there in the first place, they could not be reinstated.

Applying the factors relied on by the majority the evidence is overwhelming that the 2006 amendment clarified and did not change the Premises Liability Act. First, the Bill Summary for H.B. 06–1237 states that it clarifies the applicability of certain statutory provisions. Second, the fiscal note states that the bill clarifies. Third, the co-sponsor in the Senate stated that the amendment clarifies the pre-statutory defenses of comparative negligence, third party at fault, and assumption of the risk. Fourth, Representative Carroll stated that the purpose of H.B. 06–1237 was to reinstate statutory defenses. The majority bases its opinion on the words of Representative Carroll that the purpose of the bill is to reinstate statutory defenses. In order to do so it ignores the plain meaning of the word "reinstate" and has it mean "change." Thus we are in the never-never land where words only mean what I say they mean.

Simply stated, there is no evidence that the amendment changed the law rather than clarified it. The best the majority can find to support its position is that the wording of the amendment suggests a change rather than a clarification. In H.B. 06–1237 the words "shall apply" are used, whereas in *Corsentino v. Cordova,* 4 P.3d 1082 (Colo.2000), the Colorado Supreme Court said that the phrase "shall continue to apply" indicated a clarification. Based on this difference the majority concludes that "shall apply" suggests change. I do not believe that the harsh result to landowners is supported by the fine distinction relied on by the majority.

Based on my review of H.B. 06–1237, I thus conclude that the legislature's intent was to clarify and not to change the law.

I would reverse and remand for a new trial on this issue alone. Accordingly, I take no position on the other issues discussed in the majority opinion.